IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Jessie Ree Neely, | ) | C/A No.: 1:14-1109-TLW-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On July 27, 2010, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on July 26, 2010. Tr. at 135–38, 139–45. Her applications were

denied initially and upon reconsideration. Tr. at 75–79, 81–89. On August 28, 2012, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Carla McMichael. Tr. at 27–69 (Hr'g Tr.). The ALJ issued an unfavorable decision on September 6, 2012, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 10–21. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–4. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on March 24, 2014. [ECF No. 1].

       B.      Plaintiff's Background and Medical History

            1.      Background

Plaintiff was 62 years old at the time of the hearing. Tr. at 32. She completed high school and obtained certification as a nurse's aide. Tr. at 34. Her past relevant work ("PRW") was as a nurse's aide, a weaver, and a machine operator. Tr. at 65. Plaintiff requested a closed period of disability from July 26, 2010, through March 31, 2012. Tr. at 40.

            2.      Medical History

Plaintiff was admitted to Laurens County Hospital November 14–17, 2009, for dehydration, acute gastroenteritis, hypertension, hypoproteinemia, hypocalcemia, hypomagnesemia, and ureteral ileostomy. Tr. at 247.

Plaintiff followed up with Akhtar Hussain, M.D. ("Dr. Hussain"), on December 1, 2009, and reported that she felt better. Tr. at 433. Dr. Hussain referred Plaintiff for lab

tests to monitor her electrolytes. *Id.* He discontinued Plaintiff's prescription for Hydrochlorothiazide and prescribed Calan. *Id.*

Plaintiff presented to Laurens County Hospital on December 28, 2009, and reported a ten-day history of progressive weakness, nausea, vomiting, and diarrhea. Tr. at 430. She complained of a new onset of seizures and was found to be dehydrated and to have abnormal electrolytes. *Id.*

Plaintiff was again admitted to Laurens County Hospital with acute gastroenteritis with dehydration, new onset grand mal seizures, renal failure, and severe electrolyte abnormality on January 5–8, 2010. Tr. at 348. A CT scan of her brain on January 5, 2010, indicated no acute process, but did show evidence of an old lacunar infarct in the thalamus. Tr. at 286. An EEG showed no significant abnormalities. Tr. at 328.

Plaintiff followed up with Dr. Hussain on January 13, 2010, and reported feeling better. Tr. at 404. She weighed 118 pounds. *Id.* Dr. Hussain increased Plaintiff's prescription for Calan to 240 milligrams, instructed her to keep her appointments with the neurologist and gastroenterologist, and told her to return to the office in three months. *Id.*

On January 18, 2010, Plaintiff followed up with Dr. Ramage following her hospitalization. Tr. at 394. She reported an eight-pound weight loss and as many as 20 bowel movements daily, which included multiple nocturnal incidents. *Id.* Dr. Ramage recommended repeat colonoscopy with biopsies. Tr. at 395.

Plaintiff presented to Wayne Sida, M.D. ("Dr. Sida"), on January 20, 2010, to follow up regarding a cluster of three seizures that began the previous month. Tr. at 314–15. Dr. Sida noted that one of Plaintiff's seizures was observed in the emergency room

3

and was described as a generalized tonic clonic seizure. Tr. at 314. He observed Plaintiff to weigh 121 pounds and to have a height of 168 centimeters. *Id.* Dr. Sida recommended non-invasive vascular testing, neuroimaging of the brain, and a 24-hour ambulatory EEG. Tr. at 315. He indicated that he would provide conservative treatment if the tests were normal and cautioned Plaintiff that she should not drive for six months. *Id.*

Lab tests on January 20 and 29, 2010, indicated Plaintiff to have low magnesium. Tr. at 323, 326. An MRI of her brain on January 21 indicated advanced subcortical microangiopathy with regions of chronic ischemia in the left pontine region and basal ganglia, deep and cortical atrophy, and a small cystic structure in the right hippocampus. Tr. at 331.

On February 1, 2010, Plaintiff had a polyp removed during a colonoscopy. Tr. at 392. Dr. Ramage found no definite cause for Plaintiff's diarrhea, but noted a 12-centimeter rectal stricture. *Id.*

On February 5, 2010, Plaintiff reported to Dr. Hussain that she felt weak and exhausted and had not yet returned to work. Tr. at 427. Dr. Hussain referred Plaintiff for lab tests and instructed her to follow up with the neurologist and gastroenterologist. *Id.*

A bilateral carotid duplex scan on February 9, 2010, indicated Plaintiff to have normal common carotid artery, ECA, subclavian, and vertebral artery waveforms and velocities; tortuous vessels; anterograde vertebral artery flow; and minimal plaque within the bulb and proximal internal carotid arteries with less than 50 percent stenosis. Tr. at 329. A transcranial Doppler indicated normal ophthalmic and distal internal carotids

bilaterally. Tr. at 330. A polysomnogram on February 18, 2010, yielded normal results. Tr. at 321–22.

In a letter dated February 17, 2010, Dr. Ramage wrote that Plaintiff's previous stool studies indicated clostridium difficile colitis, but that tests subsequent to treatment were normal. Tr. at 426. Dr. Ramage prescribed Colestid and instructed Plaintiff to take Imodium before bed and to follow up in a few weeks. *Id.* On March 8, Dr. Ramage indicated Plaintiff's symptoms responded well to Colestid. Tr. at 425. Although Plaintiff complained of a new onset of itching without a rash, Dr. Ramage indicated Colestid was unlikely to cause such a reaction and instructed Plaintiff to continue using it. *Id.*

On March 10, 2010, Plaintiff reported to Dr. Hussain that her condition had improved and that she had returned to work a week earlier. Tr. at 424. Dr. Hussain instructed Plaintiff to continue her medications and to return in three months. *Id.*

On March 21, 2010, Plaintiff presented to the emergency department at Laurens County Hospital with rectal pain. Tr. at 290. She received a prescription for Ultram. Tr. at 291.

Plaintiff followed up with Dr. Sida on March 24, 2010, and reported no further seizures. Tr. at 311. Dr. Sida indicated the Plaintiff's seizures were likely caused by multiple electrolyte abnormalities and low magnesium. *Id.* On March 30, Plaintiff received an intravenous infusion of magnesium sulfate. Tr. at 310.

Plaintiff reported weakness to Dr. Hussain on April 14, 2010. Tr. at 422. She weighed 120 pounds. *Id.* Dr. Hussain gave her a work excuse to avoid heavy lifting for four weeks based on her low magnesium level. *Id.*

5

On May 4, 2010, Plaintiff reported some improvement in the frequency of diarrhea. Tr. at 419. However, she continued to report up to ten bowel movements daily and had lost another three pounds. *Id.* Dr. Ramage indicated Plaintiff may have a problem with malabsorption and recommended she undergo stool studies, upper endoscopy, and a bowel biopsy. *Id.* Lab results indicated Plaintiff's magnesium was low. Tr. at 421. Plaintiff underwent an esophagogastroduodenoscopy ("EGD") on May 25, which demonstrated diffuse, moderately severe gastritis. Tr. at 390. A biopsy of Plaintiff's stomach and duodenum indicated no specific abnormalities in the duodenum, but chronic gastritis with evidence of treated heliobacter gastritis and a proton pump inhibitor effect with changes characteristic of a fundic gland polyp. Tr. at 391. Dr. Ramage recommended capsule endoscopy to rule out inflammatory bowel disease. *Id.* A capsule endoscopy on June 18, 2010, yielded normal results. Tr. at 416. On June 25, 2010, Dr. Ramage informed Plaintiff that he was unable to find a reason for her weight loss or diarrhea. Tr. at 415.

Plaintiff presented to Dr. Hussain on July 1, 2010, with perianal pruritis due to diarrhea. Tr. at 403. Plaintiff weighed 116 pounds. *Id.* Dr. Hussain prescribed Anusol HC cream to be used as needed and instructed Plaintiff to follow up in three months. *Id.*

On July 17, 2010, Plaintiff presented to the Laurens County Hospital with generalized fatigue and an acute onset of weakness, primarily in her legs. Tr. at 356. Her hemoglobin was extremely low at 6.2 and she was diagnosed with anemia. *Id.* Plaintiff was also diagnosed with hypertension, hypothyroidism, gastroesophageal reflux disease ("GERD"), and a history of bladder cancer with ileostomy. Tr. at 357–58. Her B12 level

6

was low. Tr. at 362. She was admitted for observation and received a blood transfusion. Tr. at 358.

Plaintiff followed up with Dr. Hussain on July 20, 2010. Tr. at 413. She weighed 116 pounds. *Id.* Dr. Hussain advised Plaintiff to continue her medications and to follow up with Dr. Ramage. *Id.* He indicated she could return to work on the following day. *Id.*

On July 30, 2010, Dr. Ramage wrote a letter to Brian Hunis, M.D., in which he indicated he was referring Plaintiff for urgent evaluation of hemolytic anemia. Tr. at 411–12. He noted that Plaintiff complained of 12 to 15 bowel movements per day, but that her symptoms were improved somewhat with use of Colestid. Tr. at 411. He indicated Plaintiff was severely orthostatic and expressed confusion as to why she was referred to him with such a clinical picture. *Id.*

Plaintiff presented to David Isenhower, M.D. ("Dr. Isenhower"), on August 23, 2010. Tr. at 439. She reported she had discontinued her thyroid medication. *Id.* Dr. Isenhower referred Plaintiff for lab tests to check her thyroid function and told her to follow up after the tests to review the results. *Id.*

Plaintiff followed up with Dr. Ramage on September 15, 2010, and reported experiencing between four and fifteen episodes of diarrhea daily. Tr. at 389. She described a good day as one in which she only experienced diarrhea four times and stated she was having more good days at that time. *Id.* Plaintiff was no longer anemic. *Id.* She reported minimal abdominal pain with diarrhea, but endorsed no other symptoms. *Id.* Plaintiff weighed 115 pounds. *Id.*

On September 22, 2010, Plaintiff reported to Dr. Hussain that she had stopped working and applied for disability. Tr. at 402. Dr. Hussain observed Plaintiff's weight to be 115 pounds. *Id.* He instructed Plaintiff to continue her same medications and to follow up in three months. *Id.*

Plaintiff followed up with Dr. Hussain on November 16, 2010. Tr. at 406. She weighed 120 pounds. *Id.* Dr. Hussain noted Plaintiff's GI condition to be "stable," but indicated Plaintiff was emotionally disturbed because of her health condition. *Id.* He instructed Plaintiff to continue her same medications and to consult with a mental health professional. *Id.*

Plaintiff followed up with Dr. Isenhower on December 29, 2010. Tr. at 439. She indicated she felt well. *Id.* Dr. Isenhower observed Plaintiff to have an enlarged thyroid, but no tenderness or mass. *Id.* He noted Plaintiff had a history of toxic thyroid goiter that was previously treated with radioactive iodine. *Id.* He indicated Plaintiff was euthyroid with persistent, but normal thyroid function. *Id.* He suggested Plaintiff follow up in a year. *Id.*

On February 4, 2011, state agency medical consultant Jack McWatters, M.D., indicated Plaintiff had no severe physical impairments and on February 23, state agency consultant Chang-Wuk Kang, M.D., indicated Plaintiff had no medically-determinable psychiatric impairment. Tr. at 441, 456.

On May 26, 2011, Plaintiff presented to Good Shepherd Free Clinic, complaining of osteoarthritis in her upper arms, pelvis/hip joints, and left knee. Tr. at 470. She complained that Naproxen and Tramadol were not helping. *Id.* Plaintiff complained of

diarrhea due to ileostomy. *Id.* She weighed 132 pounds. *Id.* The provider observed no abnormalities during the examination. Tr. at 470–71.

Plaintiff established treatment at Calhoun Falls Family Practice on August 24, 2011. Tr. at 525. She complained of hypertension, osteoarthritis, anxiety, and neck pain with radiation through her left arm and fingers and stated that Ultram did not help her pain. *Id.* Kam Chan, M.D. ("Dr. Chan") noted Plaintiff's weight to be 132 pounds. *Id.* Plaintiff indicated she exercised by engaging in walking and situps. *Id.* Dr. Chan observed Plaintiff to have moderately reduced lateral motion and a tender cervical spinous process, but normal grip strength in both of her hands. *Id.* He prescribed Verapamil HCL CR for hypertension, Omeprazole for GERD, Meloxicam and Ultram for osteoarthritis, Paxil for generalized anxiety disorder, and Neurontin for neck sprain and strain. Tr. at 526. He referred Plaintiff for an x-ray of her cervical spine and instructed her to follow up in three months. *Id.* The x-ray indicated mild spondylosis most prominent at C5-6. Tr. at 532.

Plaintiff was admitted to Laurens County Hospital January 11–15, 2012, for a two-week history of abdominal pain, accompanied by nausea and vomiting. Tr. at 494. She was diagnosed with biliary dyskinesia and hydroureteronephrosis with ureteroileostomy. Tr. at 491. Lab tests indicated Plaintiff had slightly low hemoglobin, magnesium, phosphorus, and calcium. *Id.* Plaintiff's condition improved and she was discharged once she was able to tolerate solid low-fat foods. Samuel Wilson, M.D. ("Dr. Wilson"), indicated Plaintiff would likely require cholecystectomy and instructed her to follow up in his office. Tr. at 492–93.

Plaintiff was admitted to Laurens County Hospital January 24–26, 2012, for cholecystectomy. Tr. at 475–76. Her preoperative diagnoses included biliary dyskinesia and a tiny gallbladder polyp; existing ureteroileostomy; and known hiatal hernia. Tr. at 484. The surgeon also discovered during surgery that Plaintiff had major adhesions in her abdomen. *Id.* Upon discharge, Plaintiff was directed to avoid driving for two weeks and lifting over 15 pounds for three weeks. Tr. at 478.

Plaintiff followed up with Dr. Chan on March 29, 2012. Tr. at 527. Dr. Chan indicated Plaintiff had severe hypokalemia and recent surgery to remove her gallbladder. *Id.* Plaintiff indicated that she had severe diarrhea and that she sometimes had to take four potassium supplements to avoid hospitalization. *Id.* Plaintiff weighed 122 pounds. Tr. at 528. Dr. Chan referred Plaintiff for a complete metabolic panel that indicated slightly high serum creatinine, high triglycerides, and low thyroid stimulating hormone. Tr. at 528, 530–31.

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing on August 28, 2012, Plaintiff testified she was 5'6" tall and weighed 120 pounds. Tr. at 33. She indicated her normal weight to be 130 to 135 pounds and stated she had lost weight because of diarrhea. *Id.* She stated she supported herself with Social Security retirement benefits, food stamps, and a pension from her work with the state. Tr. at 35. She indicated she had not attempted to find other work since July 2010. Tr. at 40.

Plaintiff testified she had a driver's license, but only drove short distances. Tr. at 36. She indicated that her daughter drove her to the hearing and stopped once during the 25-mile trip for her to use the restroom. Tr. at 36–37.

Plaintiff testified she last worked for nine years as a caregiver at Whitten Center. Tr. at 37. She indicated she stopped working in July 2010 because of her illness, which had caused her to tire easily and to miss work frequently. Tr. at 38, 41. Plaintiff indicated she had experienced diarrhea since undergoing an ileostomy in 1985, but that it worsened until it became uncontrollable. *Id.* She stated that, while working, she was sometimes unable to make it to the bathroom in time and had to change her clothes. *Id.* Plaintiff testified she typically experienced diarrhea every other day, but at least twice a week. Tr. at 42. She indicated her diarrhea sometimes occurred so frequently that she was unable to sleep. Tr. at 42. She stated that the diarrhea sometimes occurred off-and-on over a four hour period, but lasted all day at other times. Tr. at 43. Plaintiff indicated she had a colostomy bag and wore adult diapers. Tr. at 44. She testified she experienced pain in her stomach, back, and legs, as a result of the diarrhea. Tr. at 46. She indicated she took Tramadol for pain. Tr. at 47. The ALJ pointed out that Plaintiff's weight had increased by five pounds since she filed her application for disability benefits. Tr. at 59. She asked Plaintiff to explain why her weight increased if she was having diarrhea as frequently as she alleged. *Id.* Plaintiff stated she assumed that it was because she ate more. *Id.* The ALJ also pointed out that Plaintiff's anemia had resolved. *Id.* Plaintiff stated that she received monthly B12 injections. Tr. at 60. She indicated she had a history of cervical cancer, but that it was in remission. Tr. at 61.

Plaintiff testified she could walk less than half a mile because of leg pain. Tr. at 48. She stated she could stand for ten minutes and sit for 20 minutes at a time. Tr. at 48–49. Plaintiff endorsed difficulty lifting, but was able to lift a purse that weighed slightly less than a gallon of milk. Tr. at 50. She indicated she had difficulty climbing the three steps on her back porch. *Id.* Plaintiff denied difficulty bending, stooping, squatting, or using her hands. Tr. at 50–51.

Plaintiff testified she typically awoke around 8:00 a.m. Tr. at 52. She stated she showered and dressed herself. *Id.* She indicated she prepared small meals for herself, but that her daughter sometimes prepared larger meals. *Id.* She stated she would lie down and watch television after breakfast. Tr. at 53. She indicated she used the computer for 10 to 15 minutes at a time. *Id.* She testified she sat outside on her porch for a while and then went inside to lie down. *Id.* Plaintiff stated her daughter typically went to the store and purchased her lunch. Tr. at 54. Plaintiff indicated she sat on the porch and spoke with friends, used the telephone, and read during the afternoon. *Id.* She stated that her daughter prepared or picked up a meal for their dinner. *Id.* Plaintiff indicated she went to bed around 10:00 p.m. Tr. at 55.

Plaintiff testified she usually used paper plates, but was able to wash small dishes. Tr. at 56. She indicated she could make her bed and put her clothing in the washing machine. Tr. at 56–57. She stated she was unable to vacuum, mop, or sweep. Tr. at 57. She indicated she had friends over to her house for Bible study on Tuesdays, but did not attend church services. Tr. at 58.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Celena Earl reviewed the record and testified at the hearing. Tr. at 64–68. The VE categorized Plaintiff's PRW as a nurse's aide, *Dictionary of Occupational Titles* ("*DOT*") number 355.674-014, as medium with a specific vocational preparation ("SVP") of four; a weaver, *DOT* number 683.682-038, as light with an SVP of four; and a machine operator, *DOT* number 619.685-062, as medium with an SVP of three. Tr. at 65. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform the full range of medium work. Tr. at 65. The VE testified that the hypothetical individual could perform all of Plaintiff's PRW. Tr. at 66. The ALJ asked the VE to identify other jobs at the medium exertional level that an individual could perform in addition to Plaintiff's PRW. *Id.* The VE identified jobs at the medium exertional level with an SVP of two as a kitchen helper, *DOT* number 318.687-010, with 3,236 positions in the region and 174,791 positions in the United States; a dining room attendant, *DOT* number 311.677-010, with 3,925 positions in the region and 222,880 positions in the United States; and a hand packager, *DOT* number 920.587-018, with 3,285 positions in South Carolina and 165,867 positions in the United States. Tr. at 66. The ALJ asked the VE to assume the individual could perform light work. *Id.* She asked whether the individual would be able to perform any of Plaintiff's PRW. *Id.* The VE stated the individual could perform Plaintiff's PRW as a weaver and other light jobs with an SVP of two as a cashier II, *DOT* number 211.462-010 with 22,119 positions in South Carolina and 1,125,383 positions in the United States; a mail clerk, *DOT* number 209.687-026, with 504 positions in South Carolina and 70,976 positions in the United

13

States; and a small parts assembler, *DOT* number 706.684-022, with 3,722 positions in

South Carolina and 87,260 positions in the United States. Tr. at 67. The ALJ asked the

VE to assume that due to a combination of medical conditions, associated pain, and a

need for five to six restroom visits, the individual would require breaks for four hours in

addition to regularly-scheduled breaks. Tr. at 67–68. The VE indicated those restrictions

would preclude competitive work at all exertional levels. Tr. at 68.

2.    The ALJ's Findings

In his decision dated September 6, 2012, the ALJ made the following findings of

fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security
Act through December 31, 2014.
2.    The claimant has not engaged in substantial gainful activity since July 26,
2010, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et
seq.).
3.    The claimant has the following severe impairment: gastrointestinal system
disorder (20 CFR 404.1520(c) and 416.920(c)).
4.    The claimant does not have an impairment or combination of impairments
that meets or medically equals the severity of one of the listed impairments
in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d),
404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.    After careful consideration of the entire record, the undersigned finds that
the claimant has the residual functional capacity to perform the full range of
medium work as defined in 20 CFR 404.1567(c) and 416.967(c).
6.    The claimant is capable of performing past relevant work as a nurse aide,
weaver and machine operator. This work does not require the performance
of work related activities precluded by the claimant's residual functional
capacity (20 CFR 404.1565 and 416.965).
7.    The claimant has not been under a disability, as defined in the Social
Security Act, from July 26, 2010, through the date of this decision (20 CFR
404.1520(f) and 416.920(f)).

Tr. at 15–21.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ failed to consider cervical spondylosis at step two and in assessing Plaintiff's residual functional capacity ("RFC:"); and

2)    the ALJ did not adequately assess Plaintiff's RFC.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is

17

supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Severe Impairment

Plaintiff argues the ALJ erred in failing to consider cervical spondylosis as a severe impairment at step two and in assessing her RFC. [ECF No. 15 at 9–10]. The Commissioner argues the ALJ's failure to consider cervical spondylosis at step two was harmless because the ALJ found that Plaintiff had a severe impairment at step two and moved on to subsequent steps of the sequential evaluation process. [ECF No. 17 at 8–9]. She further maintains that the record does not suggest that Plaintiff's neck pain lasted for 12 months or that she had specific limitations resulting from mild cervical spondylosis. *Id.* at 9–11.

A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c); *see also* SSR 96-3p. A non-severe impairment "must be a slight abnormality (or a

combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, *citing* SSR 85-28; *see also* 20 C.F.R. §§ 404.1521(a), 416.921(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities).

Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b).

At step two, the ALJ found Plaintiff's only severe impairment to be gastrointestinal system disorder. Tr. at 15. She considered seizures, anemia, and hypertension to be non-severe impairments, but neglected to consider cervical spondylosis. Tr. at 15–16.

The undersigned recommends the court find that the ALJ did not err in her consideration of Plaintiff's diagnosis of cervical spondylosis. Although the record contains objective evidence of mild cervical spondylosis, it does not suggest that Plaintiff experienced pain for more than a very short period or that her ability to perform basic work activities was compromised because of the impairment. *See* Tr. at 532. Furthermore, the record indicates that the pain Plaintiff experienced from cervical spondylosis was adequately controlled through conservative measures. Plaintiff complained of neck pain during an office visit with Dr. Chan on August 24, 2011. Tr. at

525. Dr. Chan observed abnormalities that included tenderness and moderately reduced lateral motion, but Plaintiff had normal grip strength in both hands. *Id.* Dr. Chan prescribed several medications for osteoarthritis and neck pain during that visit that were refilled in early October 2011, but not thereafter. Tr. at 525, 527. When Plaintiff returned to Dr. Chan for treatment on March 29, 2012, she did not complain of cervical pain and Dr. Chan observed no abnormalities related to cervical spondylosis. Tr. at 527–28. The record also reflects an absence of complaints regarding neck pain during Plaintiff's hospitalization and in her hearing testimony. *See* Tr. at 32–63, 475–523. Dr. Chan did not refill Plaintiff's medications for osteoarthritis and neck pain. Tr. at 527–529. The record documents the presence of mild cervical spondylosis, but suggests only minor limitations resulting from the impairment that were adequately treated through conservative measures. *See Thompson v. Astrue*, 442 Fed. App'x 804, 806 n. 2 (4th Cir. 2011) (finding that the ALJ properly concluded that the plaintiff's mental RFC was not restricted by depression and anxiety because they had been successfully treated). Therefore, the undersigned recommends a finding that the ALJ did not err in failing to identify cervical spondylosis as a severe impairment where the record suggested it was a slight abnormality that had little or no effect on Plaintiff's ability to do basic work activities. *See* SSR 96-3p; *see also* 20 C.F.R. §§ 404.1521(a), 416.921(a).

2.    RFC Analysis

Plaintiff argues the ALJ failed to clarify the effect of her impairments on her RFC. [ECF No. 15 at 10]. She also maintains that the ALJ's RFC finding was not supported by substantial evidence. *Id.* at 11. Plaintiff contends that because the ALJ failed to include in

the RFC assessment restrictions based upon her GI problems, the ALJ essentially found them to be non-severe despite an explicit finding to the contrary. *Id.* Plaintiff argues the ALJ erroneously provided a medical opinion regarding her weight gain. *Id.* at 12. She maintains the ALJ illogically concluded she was capable of engaging in medium work based on the fact that she performed a number of sedentary activities. *Id.* at 13.

The Commissioner argues that the ALJ properly considered Plaintiff's GI problems in assessing her RFC, but that the record suggested she had no limitations beyond those assessed by the ALJ. [ECF No. 17 at 12–13]. She further maintains that Plaintiff's physicians imposed no restrictions based upon her GI problems and Plaintiff had a significant gap in treatment. *Id.* at 13.

RFC is an assessment of the claimant's ability to perform sustained work-related activities eight hours per day, five days per week. SSR 96-8p. The ALJ must identify the limitations imposed by the claimant's impairments and assess his work-related abilities on a function-by-function basis. *Id.* "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* It must be based on all of the relevant evidence in the case record, which includes medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms that are reasonably attributed to the medically-determinable impairment, evidence from attempts to work, need for structured living environment, and work evaluations. *Id.*

21

The ALJ found that the evidence did not "support such physical impairments that would render the claimant incapable of performing any work." Tr. at 17. She acknowledged Plaintiff's statements that she experienced diarrhea every other day and that it lasted for at least four hours and sometimes for the entire day. Tr. at 18. She recognized that Plaintiff wore adult diapers and had a colostomy bag. *Id.* She discussed Plaintiff's ability to perform daily activities, including bathing and dressing, cooking, watching television, using a computer, sitting on her porch, using a telephone, reading, washing dishes, making her bed, doing laundry, shopping while riding in a cart, and participating in Bible study in her home. *Id.* She pointed out that Plaintiff's physicians had not imposed any restrictions on her activities and gave great weight to Dr. Hussain's July 2010 indication that she could return to work. *Id.*

The undersigned recommends the court find that the ALJ did not properly assess Plaintiff's RFC. The Fourth Circuit recently held that "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013). Here, the ALJ's decision lacks a logical nexus between the impairment she assessed as severe and the restriction to medium work that she imposed in the RFC. She failed to explain how Plaintiff's indications that she was incapacitated for extended periods due to diarrhea restricted her to the performance of medium work, but did not affect her ability to complete sustained work-related activities for eight hours per day, five days per week. Although Plaintiff

alleged she could lift less than a gallon of milk and stand for ten minutes at a time, the ALJ found that she could lift up to 50 pounds occasionally and 25 pounds frequently and could stand for six hours out of an eight hour workday without adequately explaining that conclusion. *See* Tr. 50. While the ALJ referenced Plaintiff's daily activities, she cited no activities that were consistent with an ability to meet the standing, walking, and lifting requirements of medium work. *See* Tr. at 18. The ALJ gave great weight to Dr. Hussain's indication that Plaintiff could return to work on July 20, 2010, but ignored evidence to the contrary, including a hospital admission for blood transfusion three days before Dr. Hussain's statement and Dr. Ramage's indication that Plaintiff was having 12 to 15 bowel movements per day on July 30. Tr. at 358, 411. Because the ALJ ignored contradictory evidence in the record and because her analysis of Plaintiff's RFC was inadequate to allow meaningful judicial review, the undersigned recommends the court remand the case.

III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

May 4, 2015                                Shiva V. Hodges
Columbia, South Carolina                   United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).